

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,458

### GARY GREEN, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM CAUSE NO. F09-59380-S IN THE 282nd DISTRICT COURT
### DALLAS COUNTY

KELLER, P.J., delivered the opinion of the Court in which PRICE, WOMACK, KEASLER, HERVEY, COCHRAN and ALCALÁ, JJ., joined. JOHNSON, J., concurred. MEYERS, J., did not participate.

In November 2010, appellant was convicted of capital murder and sentenced to death.[1]

---

[1] TEX. PENAL CODE § 19.03(a); TEX. CODE CRIM. PROC. art. 37.071. Unless otherwise indicated, all future references to articles refer to the Code of Criminal Procedure.

Direct appeal to this Court is automatic.[2] Appellant raises 46 points of error. Finding no reversible error, we affirm the judgment of conviction and sentence of death.

## I. SUFFICIENCY OF THE EVIDENCE

Appellant was convicted of killing his wife, Lovetta Armstead, and Lovetta's six-year-old daughter, Jazzmen Armstead, in the same criminal transaction. In point of error twenty-six, appellant contends that the evidence is insufficient to support his conviction for capital murder. When reviewing a challenge to the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.[3] To obtain a conviction for capital murder, as charged in this case, the State was required to prove that appellant intentionally or knowingly committed murder as defined under Section 19.02 (b)(1) and murdered more than one person during the same criminal transaction.[4]

Appellant's conviction for capital murder is supported by his own confession. In it, he explained that the week before the offense, he had discovered that Lovetta was going behind his back to get their marriage annulled. On the day of the offense, September 21, 2009, Lovetta wrote two letters to appellant, telling him that it was time for them to part ways and that he needed to move out. Appellant felt betrayed by his wife's actions and wrote his own letter in response, detailing his plan

---

[2]  Art. 37.071, § 2(h).

[3]  *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see also Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009).

[4]  *See* TEX. PENAL CODE § 19.03 (a)(7)(A).

to "take five lives" that night, including his own. While Lovetta was reading the letter in the master bedroom, appellant took knives from the kitchen and went into Jazzmen's bedroom, where he tied her up and put duct tape over her mouth. He then brought Jazzmen into the master bedroom and laid her on the end of the bed. Appellant proceeded to struggle with Lovetta for about an hour and a half, stabbing her more than twenty-five times. Once Lovetta was dead, appellant took Jazzmen into the bathroom, filled the bathtub, and held Jazzmen under the water until she died. He stated that Jazzmen struggled so much that he had to turn his head away. He pulled her from the tub and laid her face down onto the floor. Then he took a shower, changed into dress clothes, and went to pick up Lovetta's two sons, Jerome ("J.T.") and Jerrett, from their regular church program.

Appellant's confession was corroborated by physical evidence and by witness testimony, including that of J.T. and Jerrett, who were twelve and ten years old at the time of the offense. According to their testimony, J.T. and Jerrett attended their regular church program that evening, and appellant picked them up when the program was over. They testified that they were surprised to see him because usually their mother picked them up. J.T. also noticed that appellant was wearing all black. When they arrived home, appellant told J.T. to take a shower and instructed Jerrett to put on his pajamas for bed. Appellant then called Jerrett into the kitchen to discuss issues Jerrett was having in school. As Jerrett was explaining the problems, appellant grabbed a knife, held it to Jerrett's throat, and dragged him toward the bathroom. J.T. was still in the bathroom, and he heard his brother calling for help and yelling that appellant was "going to kill him." J.T. stood at the bathroom door and saw appellant holding Jerrett by his collar. Appellant threw Jerrett into the bathroom with J.T., came in himself, and locked the door. Appellant then sat on the bathroom

counter with three knives beside him and asked the two boys why he should not kill them.

As Jerrett began to plead for their lives, saying they were too little to die and that they would not tell anyone about what had happened, appellant stabbed him in the stomach. J.T. tried to push appellant off of Jerrett, but missed. Appellant then told the boys that he was not going to kill them and told J.T. to get dressed because appellant had something to show them. As they were about to leave the bathroom, appellant suddenly put the knife up to Jerrett's throat and tried to "screw it in," but Jerrett ducked away and backed up towards the toilet. Appellant paused and then said: "All right. Come on." Appellant led the boys into their mother's room and, when they saw their mother's body, they fell to their knees crying. Appellant explained to J.T. and Jerrett that he had to kill their mother because she wanted to divorce him and he "loved her to death" and did not want her to leave him. The boys also saw their sister's body in the bathroom. Appellant changed clothes and told J.T. to hand him some pills that were on the dresser in the bathroom. Appellant then threw a cell phone on the bed and instructed the boys to call 911 after he had left. J.T. recalled that appellant said he was going to kill himself. Appellant made the boys give him a hug before he left.

After appellant fled the apartment, the boys called 911 and ran to the home of their neighbor, Latasha Bradfield. According to Bradfield's testimony, Jerrett was holding his stomach, and both boys were screaming that appellant had killed their mother and sister. Bradfield took the phone from Jerrett's hand and spoke with the 911 operator. She then went next door and verified that Lovetta was lying on the floor of the bedroom and that she was not breathing.

Officer James Jones and his partner, Officer Alder, responded to the 911 call. Officer Jones went into the master bedroom and found Lovetta lying in front of the bathroom door and Jazzmen

in the bathroom. The bathroom was covered in blood. Detective Jason Gindratt and Detective Will Vick were also called to the house on the evening of the offense. During their inspection of the crime scene, they noticed that four knives appeared to be missing from the knife block in the kitchen. The knives were later found under the microwave, on the kitchen counter, and under a cushion on the couch. The detectives also found handwritten letters in the middle of the bed in the master bedroom. Lovetta's mother, Margarita Brooks, identified the handwriting as Lovetta's and appellant's. In Lovetta's letter, she wrote that it was time for her and appellant to part and that appellant needed to move out. In appellant's letter, he expressed his anger toward Lovetta for kicking him out and laid out his plan to murder the entire family. Appellant's letter stated, "You asked to see the monster, so here he is, the monster you made me. Bitch. There will be five lives taken today, me being the 5th."

Around 2:15 a.m., hours after the murders took place, appellant, his mother, and his brother all went to a police substation. Officer Troy Smith testified that appellant's mother told him that her son might have been involved in a murder. After Officer Smith confirmed that there had been a double homicide, he placed appellant under arrest.

Homicide Detective Robert Quirk and his partner, Detective Ahearn, were called to the scene of the murders. Upon arriving, they learned that there were witnesses and that a suspect had been identified. After hearing that appellant had surrendered, they headed to the police station to meet him and conduct an interview. Detective Quirk read appellant his *Miranda* rights, which appellant

agreed to waive, and then appellant confessed.[5]  Appellant also told the detectives where to find the letters, as well as Lovetta's car, in which he had fled on the night of the murders.  When Lovetta's car was searched, a soda can and a nearly empty blister pack of Benadryl, both containing appellant's fingerprints, were found on the floorboard.  Quirk testified that about 26 of the 28 pills were gone from the Benadryl blister pack.

During the interview with Detective Quirk, appellant was cooperative and answered every question asked of him.  Appellant told Quirk that he had a history of mental illness and that he had been in a mental hospital, Timberlawn, one month before the offense.  Appellant told Quirk that he thought Lovetta and her children were plotting against him and that he heard voices telling him to commit the murders.   Appellant said he took the pills to kill himself so that the family would be back together in heaven.  Quirk testified that appellant seemed dejected and somewhat remorseful.

Forensic evidence was provided by Angela Fitzwater, a forensic biologist, who analyzed fingernail clippings taken from Lovetta.  Fitzwater compared the DNA profile taken from the clippings with the known DNA profile taken from a buccal swab from appellant.  She testified that the clippings from the right hand showed two contributors, Lovetta and appellant, and that the clippings from the left hand showed the DNA profile of appellant, which matched in nine areas.  She also testified that a sperm-cell fraction obtained from a vaginal swab taken from Lovetta during the autopsy showed appellant to be the major contributor.  Fitzwater was unable to quantify the amount of time that had elapsed between the intercourse and death, but she thought that it was recent.

Jill Urban, the medical examiner who performed Lovetta's autopsy, classified the manner

---

[5]  *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

of death as a homicide. Urban testified that Lovetta had suffered more than twenty-five stab wounds, including one in the right back that had punctured the right lung and one on the back of the left thigh that was eight inches deep. There were stab wounds on Lovetta's elbow and right hand, as well as clusters of stab wounds in the right upper quadrant of her abdomen, on the back of her neck, and on her upper back. The wounds were all consistent with appellant's confession.

Meredith Lann performed the autopsy on Jazzmen and also ruled the manner of death to be a homicide. Lann testified that there was a hemorrhage on the very top of Jazzmen's head and that her eyes contained small burst blood vessels, also known as petechia. Jazzmen's lungs showed pulmonary edema, which Lann explained is the body's reaction to hypoxia, or a low state of oxygen. When examining Jazzmen's face more closely, Lann noticed a small amount of adhesive residue in an L-shape on the left cheek, which was consistent with appellant's statement that he had placed duct tape over Jazzmen's mouth. There was evidence that Jazzmen's hands and ankles had been bound with duct tape as well. Lann testified that appellant's confession to drowning Jazzmen was consistent with those findings. The defense presented no evidence during the guilt phase of trial.

Appellant submits that no rational trier of fact could have found beyond a reasonable doubt that he was guilty of capital murder because the evidence shows that when he killed Lovetta and Jazzmen, he was suffering from a mental illness and was not cognizant of what he was doing. He argues that he was delusional and paranoid and thought his family was conspiring against him.

There is no diminished capacity defense in Texas, only the insanity defense, which appellant

is not claiming.[6] The Texas legislature has not enacted any affirmative defense, other than insanity, based on mental disease, defect, or abnormality.[7] Diminished capacity, at best, negates the required mental state. In order for diminished capacity to negate the required mens rea, the jury would have to believe that appellant suffered from a mental illness, that he was suffering from that very mental illness at the time of the murders, and that, because of the mental illness, he was not acting intentionally or knowingly when he committed the murders.

The record shows that evidence of appellant's mental illness was not presented until the punishment phase of trial. Moreover, even if appellant had presented such evidence during the guilt stage, given the motive, the letter, and the confession, a rational trier of fact could still have found beyond a reasonable doubt that appellant was guilty of capital murder. Point of error twenty-six is overruled.

## II. VOIR DIRE ISSUES

### A. Challenges for Cause

In points of error one through fifteen, appellant claims that the trial court violated statutory and constitutional law by erroneously forcing him to use peremptory strikes on potential jurors who should have been removed for cause. He contends that, as a result, he was forced to accept an objectionable juror, Debra Story, after he had exhausted his peremptory challenges and was denied additional peremptory challenges by the trial court.

---

[6] *See Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008).

[7] *Id.*

### 1. *Applicable Law*

A prospective juror may be challenged for cause if he has a bias or prejudice against any law upon which the defense is entitled to rely.[8] Bias against the law is the refusal to consider or apply the relevant law.[9] The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law.[10] Before a prospective juror can be excused for cause on this basis, however, the law must be explained to him, and he must be asked whether he can follow that law regardless of his personal views.[11] The proponent of a challenge for cause has the burden of establishing that his challenge is proper.[12] The proponent does not meet this burden until he has shown that the prospective juror understood the requirements of the law and could not overcome his prejudice well enough to follow it.[13]

We review a trial court's ruling on a challenge for cause with considerable deference,[14] particularly when the prospective juror's responses are vacillating, unclear, or contradictory.[15] When

---

[8] Art. 35.16(c)(2).

[9] *Sadler v. State*, 977 S.W.2d 140, 142 (Tex. Crim. App. 1998).

[10] *Sells v. State*, 121 S.W.3d 748, 759 (Tex. Crim. App. 2003) (citing *Feldman v. State*, 71 S.W.3d 738 (2002)).

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007) (citing *Colburn v. State*, 966 S.W.2d 511 (Tex. Crim. App. 1998)).

[15] *Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Crim. App. 2004).

reviewing a trial court's decision on a challenge for cause, we look at the entire record of voir dire to determine whether there is sufficient evidence to support the trial court's ruling.[16]

When a trial judge errs in denying a challenge for cause against a prospective juror, the defendant is harmed if he uses a peremptory strike to remove the prospective juror and thereafter suffers a detriment from the loss of the strike.[17] To show such harm, the appellant must demonstrate that he: 1) asserted a clear and specific challenge for cause; 2) used a peremptory challenge on the complained-of prospective juror; 3) exhausted all of his peremptory challenges; 4) requested additional strikes and was denied; and 5) identified an objectionable juror who served on the jury.[18]

In the present case, the record shows that appellant used a peremptory challenge to remove each potential juror identified in issues one through fourteen after his challenges for cause to them were denied. By the time appellant challenged the juror identified in issue fifteen, Debra Story, he had exhausted all of his peremptory challenges, as well as two extra ones that had been granted by the court. Appellant's challenge for cause to Debra Story was denied, as was his request for an additional peremptory challenge, and Debra Story was seated on the jury despite appellant's objection. Because appellant received two extra peremptory challenges, to show harm he must demonstrate that the trial court erroneously denied his challenge to at least three of the complained-of

---

[16] *Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002).

[17] *Sells*, 121 S.W.3d at 758.

[18] *Id*.

prospective jurors identified in issues one through fourteen.[19]

## 2. Prospective Jurors Challenged

### 1. *Billy Chancellor*

In point of error one, appellant claims that the trial court erred in denying appellant's challenge for cause against potential juror Billy Chancellor. Appellant challenged Chancellor on the basis that "he would automatically assess the death penalty if he found the defendant guilty of capital murder," and that "he exhibited a lack of understanding of what was required of him" in answering the first special issue.

The record reflects that Chancellor understood that if he were to serve as a member of the jury, he could not determine punishment without first considering the special issues.

> Q. [STATE]: All right. Now, what I want you to do, Mr. Chancellor, I want you to assume with me then – that's when I talk about these hypotheticals, I want you to assume with me right now that we have proved this to you, that the Defendant on a certain date in Dallas County, State of Texas, caused the death of two individuals. All right?
>
> A. [CHANCELLOR]: Yes.
>
> Q. [STATE]: During the same criminal transaction. We proved it to you beyond all – any and all reasonable doubt. All right? You have found that person guilty of capital murder. Follow me so far?
>
> A. [CHANCELLOR]: Yes.
>
> Q. [STATE]: At that point what happens?

---

[19] *Saldano*, 232 S.W.3d at 93 (noting that, in order to show harm, the defendant would have to show that the trial court erroneously denied his challenges for cause to three of the complained-of venire members because he had received two extra peremptory strikes). Due to our disposition below, we need not decide whether this requirement applies to point of error fifteen, in which appellant claims that a juror who was challengeable for cause actually served on the jury.

A. [CHANCELLOR]: We look at the Issue 1, to see whether or not he will be a menace to society. At the next step would be the Issue 2, to determine that point, yes, we would give him the death penalty or it would be the life sentence.

With regard to the first special issue, Chancellor affirmed that he would consider all of the evidence before making a decision.

Q. [DEFENSE]: Now, in all honesty, Mr. Chancellor, a lot of folks tell us, they say . . . I can tell you that if I've just found guilty – somebody guilty of that crime beyond a reasonable doubt, I'm going to always vote Question Number 1 to be yes. How do you feel about that?

A. [CHANCELLOR]: I'm not going – I can't say I would always – I wouldn't be the one that always vote for that to be yes. Still, going back to the evidence itself, to me, I would evaluate all the evidence, you know, being a juror, to even make that decision regarding that situation, Number 1.

Chancellor agreed that he was "the type of person" who would not make any "automatic decisions," but would "keep an open mind" and "listen to all the evidence before deciding yes or no on [the] special issues," even if it led to a life sentence instead of the death penalty.

Q. [STATE]: Do you think you're the type of person – and I think you are – who can listen to all the facts in the case, make the determination with regards to the guilt evidence and then if the Defendant is found guilty, keep an open mind, wait to hear all the evidence again, and then answer those special issues based on the evidence. And if it leads you to any other combination to where it would be life in prison, so be it. Are you that type of person, sir?

A. [CHANCELLOR]: Yes.

Moreover, Chancellor's testimony demonstrates his understanding that the law requires probability to be more than a mere possibility.[20] Chancellor agreed with the general statement that

---

[20] *Murphy v. State*, 112 S.W.3d 592, 600 (Tex. Crim. App. 2003) (jurors must acknowledge and give effect to the fact that probability is more than a mere possibility).

"anything could possibly happen," but stated that that would not be enough for him to answer "yes" to the first special issue.

> Q. [DEFENSE]: [I]t's possible that anything can happen, is it not?
>
> A. [CHANCELLOR]: That's true.
>
> Q. [DEFENSE]: So I mean, then how would you ever be able to answer Question Number 1 that it's not possible that something could happen again?
>
> A. [CHANCELLOR]: Well, I look at – that's just something – would have to show me some type of fact that it could happen again.
>
> Q. [DEFENSE]: That's what I'm asking you right now. Just a person here in the courtroom with common sense, I mean, you agree that anything could possibly happen?
>
> A. [CHANCELLOR]: Yes, anything could possibly happen.
>
> Q. [DEFENSE]: Right. So you're telling us that would be enough for you to answer that Special Issue Number 1 yes?
>
> A. [CHANCELLOR]: No, I have to look at evidence that shows that that trait could happen again.
>
> Q. [DEFENSE]: I'm not sure I'm understanding where you're drawing that distinction at though.
>
> A. [CHANCELLOR]: I'm looking at it from where – if the prosecutor said – or someone in the case itself say [sic], you know what, we've seen this pattern going on with this person, and I think this probably could happen again, looking at a pattern.

Appellant also challenged Chancellor on the basis that he "required the defendant to show remorse for his actions," which, appellant argues, would require a defendant to testify. But the record shows that Chancellor understood the Fifth Amendment and that a defendant has the right not to testify. When asked whether he would hold it against a defendant if a defendant chose not to

testify, Chancellor replied: "No, I wouldn't hold it against him."

Finally, appellant challenged Chancellor on the basis that he would "never give meaningful consideration" to any evidence presented in punishment on the second special issue and would not consider certain evidence to be mitigating, specifically, the defendant's age or background. A venireperson is not challengeable for cause on the ground that he does not consider a particular type of evidence to be mitigating.[21] Furthermore, Chancellor indicated on multiple occasions that he would listen to all of the evidence presented and would follow the law. Based on the record before us, the trial court did not abuse its discretion in denying appellant's challenge for cause to Billy Chancellor.

## 2. *Sheila Yrigollen*

In point of error two, appellant claims that the trial court erred in denying the challenge for cause against potential juror Sheila Yrigollen. Appellant claims that Yrigollen was challengeable for cause because she "could not follow the law" and "would not hold the State to [its burden to] prove every one of the elements beyond a reasonable doubt." While the record reflects that Yrigollen may have been unsure of the law at the outset, it also reflects that once the law was explained to her, she understood that the State has the burden of proof.

> Q. [STATE]: You've got to follow the law, and what the law says is the State – we set it out and we – we do the accusing, we have to do the proving, okay?
>
> A. [YRIGOLLEN]: Okay.
>
> Q. [STATE]: And – and I tell you this not to think that we're not going to be able to

---

[21] *Joubert v. State*, 235 S.W.3d 729, 734 (Tex. Crim. App. 2007).

prove it beyond a reasonable doubt, okay, but just to show that to be a qualified juror, you have to be able to follow the law. And what the law says, you have to hold us to our burden. So if we fail to prove any element, your job as a juror in following the law would be to find someone not guilty.

A. [YRIGOLLEN]: All right.

Q. [STATE]: All right? Is that something you feel like you could do?

A. [YRIGOLLEN]: Yes.

Yrigollen understood and confirmed that she could follow the law and hold the State to proving the elements.

Q. [STATE]: But the point is to be a qualified juror, you have to follow the law. What the law says, it's our job to prove –

A. [YRIGOLLEN]: To prove –

Q. [STATE]: – the elements to you. And if we fail to do that, if we fail to do our job, then you would have to find the Defendant not guilty. Does that make sense?

A. [YRIGOLLEN]: Yes.

Q. [STATE]: And could you do that?

A. [YRIGOLLEN]: Yes.

Although Yrigollen's response to a long hypothetical posed to her by the defense does suggest that she would not hold the State to proving every one of the elements beyond a reasonable doubt, she was immediately rehabilitated by the trial court before being excused.

[THE COURT]: All right. One last thing from me. Are you going to make the State prove each and every element of the indictment that they've alleged?

[YRIGOLLEN]: Yes.

[THE COURT]: All right. Step outside, please.

Appellant also claims that Yrigollen was pro-death, that she would automatically sentence a defendant to death if found guilty, that she would automatically find the defendant to be a future danger, and that she would not consider mitigation evidence.

The record shows that Yrigollen agreed with the statement that "you can't find that somebody is automatically going to be a future danger just because of what they did, until you wait and listen to all the evidence that you hear at punishment." She confirmed that she could "keep an open mind" about the issue and would "not make any automatic answers."

Q. [STATE]: [If] you found someone guilty of a horrible, brutal, disgusting capital murder, are you automatically going to say, you know what, I'm going to have to find that they're a future danger because what they did is so bad?

A. [YRIGOLLEN]: No.

Q. [STATE]: You're going to wait and listen?

A. [YRIGOLLEN]: Wait and listen.

Q. [STATE]: And that's what the law requires, and you can follow the law, can you not?

A. [YRIGOLLEN]: Yes.

With respect to appellant's claim that Yrigollen would not consider certain evidence to be mitigating, specifically, the defendant's age or background, jurors are not required to regard any particular type of evidence as mitigating.[22] Furthermore, Yrigollen testified that she would keep an open mind and review and consider all the evidence presented before determining the mitigation issue. She confirmed that she would "keep an open mind and wait until [she heard] all the evidence

---

[22] *Id.*

to make . . . any decisions, especially as far as [the] last two special issues." When Yrigollen was asked by the defense whether her decision for the second special issue would be "pretty much made" if she answered yes to the first special issue, she responded: "No, it's not. I mean, there's a lot of factors, evidence – I mean, I – I would keep an open mind. I mean, I don't go in there with a mind-set death sentence, that's it. Okay."

Finally, appellant claims that Yrigollen was challengeable because she had a bias toward law enforcement. As the State points out, this argument was not raised in the trial court and was therefore not preserved for review.[23] Regardless, we have held that as long as a potential juror does not have an extreme or absolute position regarding the credibility of any witness, he or she is not challengeable for cause simply for being more skeptical toward one category of witnesses over another.[24] Yrigollen testified that she understood that the "law says that we have to start off every witness equally that gets up on the witness stand." She further testified that she would not "believe everything a police officer says just because they're a police officer." Based on the record before us, the trial court did not abuse its discretion in denying appellant's challenge for cause to Sheila Yrigollen.

### 3. *Norma Wiley*

In point of error three, appellant claims that the trial court erred in denying the challenge for cause against potential juror Norma Wiley. Appellant claims that Wiley was challengeable for cause

---

[23] TEX. R. APP. PROC. 33.1(a); *Sells*, 121 S.W.3d at 758.

[24] *Jones v. State*, 982 S.W.2d 386, 389-90 (Tex. Crim. App. 1998) (citing *Hernandez v. State*, 563 S.W.2d 947 (Tex. Crim. App. 1978)).

because she "would not consider the mitigation evidence presented by the defense." When this challenge was raised before the trial court, the State responded that Wiley had merely been confused by some of the questions and that, once the special issues were explained to her, she stated unequivocally that she could be fair, that she would follow the law, and that she would be open to considering mitigating circumstances. The record supports the State's position.

During voir dire, Wiley was asked whether it would be appropriate for her to make up her mind as to whether a defendant should receive a death sentence before the jury has gone back to deliberate on the two special issues. She responded: "No, because if I did, then I'm breaking the law. If the law says that I have to wait and hear the second set of circumstances first before I reach that decision, then I have to wait." She agreed that it seemed fair that she would answer the special issues only after hearing all of the evidence presented.

When the State described a hypothetical case with hypothetical mitigating circumstances to Wiley, the following exchange occurred:

> Q. [STATE]: So I'm not saying that [this hypothetical] is sufficient mitigation or isn't sufficient, I'm just trying to give you some ideas in your mind to kind of think about. Is that something you would be open to?
>
> A. [WILEY]: The mitigating circumstances?
>
> Q. [STATE]: Yes.
>
> A. [WILEY]: And thinking about it, absolutely, yeah.
>
> Q. [STATE]: And not just mitigating, because you might hear a lot of mitigating, but sufficiently mitigating to – to go from that – what's about to be a death sentence to kind of take it back to a life sentence?
>
> A. [WILEY]: Yes.

Appellant also claims that Wiley was challengeable for cause because she was a strong supporter of the death penalty and believed that it was sanctioned by the Bible, that she would automatically find the defendant to be a future danger if she found him guilty of capital murder, that she exhibited a bias toward police because she has two sons who are police officers, and that she would need the defendant to testify so that she could look him in the eye and determine whether or not he was lying. The record reflects that none of these issues were raised in the trial court and were therefore not preserved for review.[25] Even if these issues had been raised, Wiley stated on numerous occasions that she would follow the law. She also stated that she would not give police officers any more credibility than anyone else.[26] Finally, Wiley understood and agreed that a defendant has an absolute right not to testify and that, as a juror, she could not hold that against him. Based on the record before us, the trial court did not abuse its discretion in denying appellant's challenge for cause to Norma Wiley.

### 4. *Elizabeth Lopez*

In point of error four, appellant claims that the trial court erred in denying the challenge for cause against potential juror Elizabeth Lopez. Appellant challenged Lopez on the basis of "her answers [on] the questionnaire in regards to being able to follow the law . . . as well as some of her answers . . . in the courtroom." Appellant's objection before the trial court was not specific enough

---

[25] *See* footnote 23.

[26] As we have already mentioned, as long as a potential juror does not have an extreme or absolute position regarding the credibility of any witness, he or she is not challengeable for cause simply for being more skeptical toward one category of witnesses over another. *Jones*, 982 S.W.2d at 389-90.

to preserve error for appellate review.[27]  In any event, Lopez stated on the record that she would be able to follow the law.  She agreed that, if the State failed to meet its burden of proof, in order to be a qualified juror she would have to follow the law and find the defendant not guilty.  She further agreed that she would be able to "keep an open mind and wait and listen to all of the evidence presented at the guilt phase and also at the punishment phase" before making any decisions with regard to the two special issues.  Based on the record before us, the trial court properly denied appellant's challenge for cause to Elizabeth Lopez.

### 5. *Cathey Young*

In point of error five, appellant claims that the trial court erred in denying the challenge for cause against potential juror Cathey Young.  Appellant challenged Young based on her statement that she did not believe in life without parole, which, appellant argues, suggests that she would not give meaningful consideration to any mitigating evidence presented to her.

The statement to which appellant is referring occurred during the  following exchange:

Q. [STATE]: Are you of the opinion that all capital murders should be eligible – I mean, should seek the death penalty?

A. [YOUNG]: I don't really believe in life in prison.

Q. [STATE]: Okay.

A. [YOUNG]: I think it's a – it's a burden on the State –

Q. [STATE]: Yes, ma'am.

A. [YOUNG]: – financially.

---

[27] *See* footnote 23.

Q. [STATE]: Yes, ma'am.

A. [YOUNG]: And I just don't believe in life in prison.

Q. [STATE]: Okay. Well, and – well, then let me ask you this, Ms. Young. With you not believing in life in prison, is there any scenario whatsoever that you would see where life in prison would be proper in regards to when you have those options?

A. [YOUNG]: I'd just have to look at the individual circumstance and say, well, I was wrong. This one time it's right.

The record shows that although Young stated that she did not believe in life in prison, she was commenting on the financial burden that it places on the State. She then immediately conceded that she *could* find life in prison to be appropriate, depending on the individual circumstances of a case. Young agreed that she would "have no choice" but to follow the law, regardless of her personal views, because "it's the right thing to do."

A. [YOUNG]: Let me put it this way. When you're on a jury, it's a job.

Q. [STATE]: Yes, ma'am.

A. [YOUNG]: Your job is to listen to what's presented to you, whether you like it or not, whether you agree with it or not, and do what the law tells you to do. And that's the way I look at it, right, wrong, indifferent, that would be my job for however long it took.

Young stated that, even after finding a defendant guilty, she could keep an open mind and wait to hear the evidence presented at punishment before making a decision on the special issues. She further stated that she would give fair consideration to all of the evidence, including any mitigation evidence. Based on the record before us, the trial court properly denied appellant's challenge for cause to Cathey Young.

6. *Aneta Johnson*

In point of error six, appellant claims that the trial court erred in denying the challenge for cause against potential juror Aneta Johnson. Appellant challenged Johnson because "her answers to the questions show [that she believed] a finding of guilty to any type of premeditated, intentional act of murder would be sufficient in her mind for a sentence of death." Appellant described Johnson as "death prone," and argued that "she equates guilt with death." He further argued that, based on her statement that the death penalty should not be applied to anyone who was acting in self-defense, Johnson did not understand capital murder. Appellant claimed that, based on her responses and statements, Johnson would be unable to follow the law and give fair consideration to the mitigation special issue.

The record shows that at one time Johnson "kind of thought that maybe it wasn't right to take other people's lives." But her views changed and she became more in favor of the death penalty in her thirties after an experience involving a felony committed against a young child. Still, Johnson stated that her belief in the death penalty depended "on the situation [and] the circumstances" and that her view of the death penalty was not extreme.

Q. [DEFENSE]: Well, now that that happened and your views changed, do you think you've kind of gone the other way to the other end of the extreme or –

A. [JOHNSON]: No, I do not. I think that I would still be able to make, you know, a decision on – like I say, depending on the circumstances.

The record shows that Johnson personally considered premeditation to be an important factor in deciding whether the death penalty is warranted. However the record also shows that she understood and agreed that, regardless of her personal views, under the law premeditation alone would not be enough to automatically decide in favor of the death penalty. The defense asked

whether a death sentence would be appropriate for a hypothetical premeditated murder "if one of the other factors weren't involved, such as the death of a policeman and a fireman [or] child under the age of six," and Johnson responded: "No, I would have to go by what the law says . . . ." Defense counsel then asked Johnson about a hypothetical premeditated offense that did involve one of the other factors:

> Q. [DEFENSE]: Okay. Now, you understand that just being guilty of [a premeditated capital offense] automatically does not mean that you're going to get a sentence of death?
>
> A. [JOHNSON]: Right.
>
> Q. [DEFENSE]: Okay. But it sounds to me like you're saying if it was shown to you that it was a premeditated commission of one of those offenses, that [you think the defendant] should always receive death; is that correct?
>
> A. [JOHNSON]: No, because – I mean, I would have to go as far as the special issues, you know, as far as giving them, you know, the death penalty.

Appellant argued that Johnson did not understand capital murder, as evidenced by her statement that the death penalty should not be applied to anyone who was acting in self-defense. The record shows that Johnson affirmed her understanding of capital murder after it was explained to her.

> Q. [DEFENSE]: Now, capital murder is a knowing, intentional taking of a life under the circumstances that we talked about. And the type of indictment that we have in this case, it's the knowing and intentional murder of two or more people at the same time or in the same criminal transaction. And, ma'am, I think I've made it clear, but I want to make sure. We're not talking about any kind of accident. We're not talking about any kind of self-defense. We're not talking about defending your property. We're not talking about defending a loved one. It's not insane. You intended and knowingly and intentionally took the lives of more than one person at the same time, okay? And these people – you know it's pretty obvious, they're going to be innocents. They're going to be people who didn't deserve it, didn't have it coming. So you see the kind of cases we're talking about?

A. [JOHNSON]: Yes.

Johnson stated that she could follow the law and consider all of the evidence presented, including mitigation evidence, before considering the two special issues. When she was asked by the defense whether she could "honestly come in here in this courtroom and perform [juror] duties in the way the law envisions," she replied: "I believe I can honestly do that to the best of my abilities." Johnson stated that she could "assure" defense counsel that she could "separate [the] crime itself from an automatic answer as to whether the person should receive a sentence of death."

Q. [STATE]: So what the law says is, look, Ms. Johnson, we can't jump to any conclusions just because we hear facts of a case. We have to wait and hear all evidence at punishment, then we can decide. Does that make sense?

A. [JOHNSON]: Yes.

Q. [STATE]: Okay. And that's something that you could do?

A. [JOHNSON]: Yes.

Q. [STATE]: And, again, you could hold the State to our burden and understand we're the ones that have to prove this to you beyond a reasonable doubt. And, again, the Defense doesn't have to show you anything in regards to Special Issue Number 1. You with me?

A. [JOHNSON]: Yes.

Q. [STATE]: Okay, good. All right. So – now, let's – let's make sure we're on the same page. You're on my capital murder jury. You've found someone guilty of capital murder, a horrible, brutal, cold-blooded, terrible crime, okay? Now, you've just now come in and found him guilty. You haven't heard punishment yet. Have you made any automatic decisions about how you're going to answer either one of those special issues at this point?

A. [JOHNSON]: No.

Q. [STATE]: You're going to wait until you hear the punishment evidence before

you make any decisions, right?

A. [JOHNSON]: Yes.

Johnson also stated that, with respect to mitigation evidence, she could be open-minded about imposing a life sentence if appropriate.

> Q. [DEFENSE]: The law says that you have to go back and do this examination yourself.

> A. [JOHNSON]: Oh, I can do that. I can go back and re-examine and have an open mind.

> Q. [DEFENSE]: Okay. So you say you could go back and have an open mind as to whether or not there's something there that was sufficient in your mind to switch that from – from – to switch or to make the sentence of life without parole – to impose that sentence rather than a sentence of death?

> A. [JOHNSON]: I could be open-minded about it.

Appellant has also claimed that Johnson was challengeable because she did not understand the meaning of "probable." However the record shows that this argument was not raised in the trial court and is therefore not preserved for review.[28] Moreover, the record shows that she agreed that "probable" had to be "more than a mere possibility." Based on the record before us, the trial court properly denied appellant's challenge for cause to Aneta Johnson.

### 7. *Terry Crawford*

In point of error seven, appellant claims that the trial court erred in denying the challenge for cause against potential juror Terry Crawford. Appellant objected to Crawford because, based on her answers regarding her family and work schedule, she "would not be able to devote her full attention

---

[28] *See* footnote 23.

to the trial." Crawford explained that she is a mother of six, that her husband is a firefighter who works twenty-four-hour shifts, and that she watches the children when he is working. She also stated that she works as a sleep-study technician. When asked whether serving on a jury would cause her some type of "extreme hardship," Crawford expressed some concern about not being available to watch her children while her husband is at work. However she then stated that she could "probably make arrangements" with family members. She also expressed some concern about missing work, but was relieved when it was explained to her that her employer could not fire her for serving on the jury. Crawford affirmed that if she were selected as a juror, she could give the case her full attention and would not be distracted by things going on at home. Appellant also argues that Crawford should have been disqualified by the trial court because she was the only one qualified to use specialized equipment at her job. He states in his brief: "Certainly there were enough jurors to question and qualify without jeopardizing the health of citizens by removing for at least two weeks the only person qualified to operate such equipment." This specific claim was not raised in the trial court and is therefore not preserved for review.[29] Even if this claim had been raised in the trial court, there is nothing in the record to suggest that Crawford's absence would jeopardize anyone's health. Moreover, the record shows that Crawford testified that she was not "the only one in this world that could ever [operate the equipment]." Finally, the possible effect on Crawford's patients is not relevant to whether the challenge for cause was properly denied. We find that the evidence was sufficient for the trial court to believe that Crawford would not be distracted, but could properly carry out her duties as a juror. Based on the record before us, the trial court properly denied appellant's

---

[29] *Id.*

challenge for cause to Terry Crawford.

## 8. *Barbara Garrett*

In point of error eight, appellant claims that the trial court erred in denying the challenge for cause against potential juror Barbara Garrett. Appellant objected to Ms. Garrett because her answers to the questionnaire and on voir dire "show that she would automatically assess a death sentence if she found a defendant guilty of capital murder."

Once the law was explained to her, Garrett said that she would not make an automatic decision in determining appellant's sentence, but would listen and consider all the evidence before answering the special issues.

> Q. [STATE]: Do you think you're the type of person who could wait and not make any automatic decisions knowing that, you know what, I just found somebody guilty of probably the worst thing I've heard of and I know he's looking at life or death, but I have to wait and listen to all the evidence before deciding. Do you think you can do that?
>
> A. [GARRETT]: Yes.

Ms. Garrett stated that she could hold the State to its burden. She also affirmed that she would wait to hear all of the evidence presented at punishment, including mitigation evidence, before making a decision about the special issues.

> Q. [STATE]: And that's why it's important to wait and keep an open mind before deciding. Does that make sense?
>
> A. [GARRETT]: Yes.
>
> Q. [STATE]: And – and neither side could ask you what you, Ms. Garrett, thinks is sufficiently mitigating to warrant sparing this person's life. It's more of a are you the type of person who will follow the law, who will wait, come back in the punishment stage, listen to all the evidence. Then go back when you're deliberating on these two

special issues and deliberate all the evidence in good faith and then answer those special issues.

A. [GARRETT]: Okay.

Q. [STATE]: Do you think you can do that?

A. [GARRETT]: Yes.

Based on the record before us, the trial court properly denied appellant's challenge for cause to Barbara Garrett.

### 9. *Thomas Frazier*

In point of error nine, appellant claims that the trial court erred in denying the challenge for cause against potential juror Thomas Frazier. Appellant claims that Frazier was challengeable for cause because he did not seem to understand the issues and law and that he is "death prone"and would automatically assess the death penalty.

The record reflects that the prosecutor gave Frazier a thorough explanation of what constitutes capital murder in Texas. The prosecutor also explained the two phases of a criminal trial, the State's burden of proof, the two special issues, the Fifth Amendment, the weight to be given witness testimony, and the presumption of innocence. Throughout the explanations, Frazier affirmed his understanding. He conceded that, prior to these explanations, he had not completely understood the law. But after the law was explained to him, when defense counsel asked whether Frazier could "operate as a juror under that framework and under that understanding of what the law actually is," he responded: "Yes, I can."

The record reflects that Frazier understood that a guilty verdict does not automatically equate

to a death sentence and he affirmed that he could follow the law. He said that he "would never disregard anything that was presented to [him] as evidence . . . and [he] would never come to a decision based on emotion or anything that's unfair." He described himself as "a conscientious citizen . . . dedicated to upholding the law."

> Q. [DEFENSE]: Okay. Law in our state says the person found guilty of capital murder is going to receive life without the possibility of parole.
>
> A. [FRAZIER]: I can go along with that. I can go along with the law. I mean, I don't have any big problems with our law. I believe in our laws.

In addition to stating that he could follow the law, Frazier also stated that he would not make any automatic decisions with regard to punishment.

> Q. [STATE]: So if you found someone guilty of capital murder, at that point before you've heard the punishment evidence, would there be any automatic answers for you as far as those two special issues at that point?
>
> A. [FRAZIER]: No. I wouldn't have enough information. I'm hoping to learn more about the Defendant as the process goes along.

Frazier affirmed that he would give fair consideration to all evidence presented. His testimony demonstrates that he was not, as appellant claims, "death prone," and would not automatically assess a sentence of death.

> Q. [DEFENSE]: A lot of people just say if I've just found him guilty of a terrible, horrible crime, I'm automatically going to answer that question yes.
>
> A. [FRAZIER]: No, no. There's too many circumstances where they wouldn't – that couldn't happen. I mean, what was the emotion – emotional makeup of the person at the time the crime was committed?
>
> Q. [DEFENSE]: Okay.
>
> A. [FRAZIER]: Were there – was there something going on that made that period

exceptional?

Q. [DEFENSE]: Right.

Appellant also argues that Frazier was challengeable because in his mind he had already formed a conclusion as to the guilt of the defendant, which would impede his ability to be a fair juror in violation of Article 35.16 of the Code of Criminal Procedure.[30]  The record reflects that Frazier read "in between the lines" of defense counsel's questioning and believed that there was not going to be an issue of guilt in this case, only punishment.  During questioning by the defense, Frazier stated: "Everything that I've heard today and even when I was here a month ago tells me that you've [defense counsel] already convicted the Defendant, that he's guilty."  Frazier further stated: "You as a Defense attorney already [have] told me that you think your Defendant is going to be found guilty . . . [y]ou're basically concerned about what's going to happen to him as far as punishment." The record reflects that Frazier was merely commenting on defense counsel's position, not his own, and that he had not yet formed an opinion as to the defendant's guilt.  In fact, Frazier stated that defense counsel's position "doesn't make any difference to [him] as a juror."  He further stated: "I have my duty to do as a juror based solely on the evidence and on – maybe on learning a little bit about the Defendant."  Frazier again clarified that he was commenting only on the defense position, not his own, when he stated: "[Y]ou're concerned more about what's going to happen after the Defendant has been found guilty.  As a juror, I can't even – I can't say that he's guilty at this point. I've got to wait.  I'm not sure that he is guilty.  I don't have no way of knowing."  Frazier's

---

[30] Art. 35.16(a)(10) (providing that a challenge for cause may be made against a juror if there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence the juror in finding a verdict).

statements demonstrate that he had not yet formed an opinion as to the defendant's guilt and that he would follow the law and consider all evidence presented before coming to any conclusions.

Appellant also claims Frazier was biased toward law enforcement. This argument was not raised in the trial court and is therefore not preserved for review.[31] Furthermore, the record reflects that Frazier's position regarding the credibility of police officers was neither extreme nor absolute.[32] Based on the record before us, the trial court properly overruled appellant's challenge to Thomas Frazier.

### 10. *Sreenivasareddy Thallapareddy*

In point of error ten, appellant claims that the trial court erred in denying the challenge for cause against potential juror Sreenivasareddy Thallapareddy. Appellant challenged Thallapareddy because, "based on several of his answers," appellant did not believe that he would be able to follow the law. This objection before the trial court was not specific enough to preserve error for appellate review.[33] In any event, the record reflects that Thallapareddy understood and could follow the law. He stated on the record: "I will follow the law as my civic duty." He also stated that he would hold the State to its burden: "I mean, if [the State] cannot prove it, I have to say he's not guilty." He affirmed that, if the State failed to meet its burden, he would "be okay with acquitting" a defendant, stating, "Yes, because I mean, that's what the law says." Thallapareddy stated that he would listen to all the evidence before answering the special issues, and that he could keep an open mind and

---

[31] *See* footnote 23.

[32] *See* footnote 24.

[33] *See* footnote 23.

spare someone's life if he heard sufficiently mitigating evidence. The trial court properly denied appellant's challenge for cause against Sreenivasareddy Thallapareddy.

### 11. *William Ogle*

In point of error eleven, appellant claims that the trial court erred in denying the challenge for cause against potential juror William Ogle. Appellant challenged Ogle because he would not consider certain mitigating evidence, namely "genetics, circumstances of birth, upbringing, and environment." We have held that jurors are not required to regard any particular type of evidence as mitigating.[34] Moreover, the record shows that Ogle specifically stated his belief that "not in every case do I think that you should get the death penalty for capital murder." He also stated that he could follow the law and give fair consideration to all evidence presented, including mitigation evidence, before coming to a conclusion about the two special issues. When the defense asked: "Can you envision a circumstance where you can consider [mitigating circumstances] if you are a juror on this case?" Ogle responded: "Yes."

> Q. [DEFENSE]: And a lot of people say, I'm not going to take those things into consideration, I've already made up my mind, he's a murderer, okay? All those things, the reasons that he could be a capital murderer, he's a murderer. I think he's going to make people victims in the future. You know what, at that point in time, I've made up my mind and I don't need to go on to Special Issue Number 2. I don't see how there could be any sufficiently mitigating or mitigating circumstances that I can consider. They even give me that answer all the time. Do you feel the same way?
>
> A. [OGLE]: No.
>
> On appeal, appellant argues that Ogle was also challengeable because he would automatically

---

[34] *Joubert*, 235 S.W.3d at 734.

assess death if the defendant were found guilty of capital-murder and that he thinks the death penalty should be reserved for "multi-murder" capital offenses. These claims were not presented to the trial court and are therefore not preserved for review.[35]

Even if these claims were preserved for our review, Ogle did not say that he would automatically assess the death penalty in all capital murder cases, nor did he say that the death penalty should be reserved for multi-murder capital offenses. When requested to tell the court how he formed his opinions concerning when the death penalty should be given, Ogle stated:

> A. [OGLE]: Well, I mean, an eye for an eye – I mean, if it's a crime where there's no – you know, if you – like if you kill an officer or if you kill somebody, if you premeditate to go in and kill two or three people, there's certain crimes that I feel like the death penalty should be for. And I mean, maybe somebody's background, if they continue to have this pattern, then there's no – there's not going to be any rehabilitation. So in those cases I feel like it is what it is. I mean, the death penalty should be there for those type of cases.

That statement indicates that Ogle merely believed that the death penalty should be an option in certain cases (e.g., where an officer or multiple people are killed). This is especially true, in Ogle's opinion, where it does not appear that the offender will, based on his or her background, ever be rehabilitated. Thus, it does not follow that Ogle believed that the death penalty was automatically warranted in every case where the defendant was convicted of capital murder or where there were multiple victims. Based on the record before us the trial court properly denied appellant's challenge to William Ogle.

### 12. *Charla Moe*

In point of error twelve, appellant claims that the trial court erred in denying the challenge

---

[35] *See* footnote 23.

for cause against potential juror Charla Moe. Appellant challenged Moe because, although she initially stated on the questionnaire that she would not consider mitigation evidence, she changed her answer during questioning and stated that she would. Appellant argued that, based on her conflicting answers, Moe would not be able to follow the law. Appellant describes Moe as a "death prone juror who would automatically assess the death penalty if she found the defendant guilty of capital murder."

The record reflects that Moe did not fully comprehend the relevant law until it was explained to her during the voir dire proceedings. She conceded that she had not understood the process of a capital murder trial until it was explained to her, stating, "I didn't fully understand what – what goes into the decisions," and that "it makes more sense now." She also stated: "I don't necessarily think everybody deserves the death penalty . . . ."

> Q. [DEFENSE]: Could you envision a scenario where you would say, you know what, I believe that person deserves death. I don't even need to go on to Special Issue Number 1 or Special Issue Number 2.
>
> A. [MOE]: Well, before today, I probably would have said yes, but since I didn't understand what those fully meant, I think I would still be able – I think I now would be able to take into – well, both of them. I think I would be able to look at both of them and see, you know – take those into account and – and then decide whether it was death penalty or life in prison.

After the law was explained to her, Moe stated on more than one occasion that she could follow the law, keep an open mind, and give fair consideration to all of the evidence presented, including mitigation evidence, before determining her answers to the special issues.

> Q. [STATE]: [Y]ou've just got to be open to looking at everything . . . including, you know, everything that it lists in there. You know, the circumstances of the offense, obviously. The Defendant's character and background, you know, his personal

responsibility and decide is there anything there that rises to such a level, to not just mitigating, but sufficiently mitigating to warrant switching that sentence back from death to life. And you sound like that's something that you would be open to listening to and hearing about?

A. [MOE]: Yes.

Q. [STATE]: Okay. So in the process, first you find someone guilty of capital murder. If – if you do that, at that point, even if it's horrible and terrible, at that point have you made up your mind as to those two special issues before you hear the punishment evidence?

A. [MOE]: No.

Based on the record before us, the trial court did not abuse its discretion in overruling appellant's challenge to Charla Moe.

### 13. *Jackie Brewer*

In point of error thirteen, appellant claims that the trial court erred in denying the challenge for cause against potential juror Jackie Brewer. Appellant challenged Brewer because his answers in the questionnaire conflicted with his answers during questioning. Appellant argues that, not only would Brewer not give meaningful consideration to mitigation evidence, but that he "would have difficulty in ever finding anything mitigating enough to change his mind from death to life."

The record reflects that Brewer stated that he would follow the law and that he was open to considering mitigation evidence. When questioned by the State, Brewer affirmed that he "wouldn't find someone guilty unless the State proved its case beyond a reasonable doubt." He also affirmed that "once [he] found someone guilty . . . [he] wouldn't automatically be able to make any answers to those [special] issues until after [he] heard the punishment evidence." With respect to the mitigation issue, Brewer stated more than once on the record that he was open to considering

mitigation evidence.

> Q. [STATE]: And then you would be open to considering – and I know you've said that three times just now, but I'm just – open to considering Special Issue Number 2, as well?

> A. [BREWER]: Yes.

Brewer did say that he could not know what specific evidence would be enough for him to go from death penalty to a life sentence until he actually heard it. However, a juror is not required to give examples of factors that he might view as mitigating.[36]

> A. [BREWER]: I wouldn't know until that moment that I got that . . . evidence.

> Q. [STATE]: And that's okay, and you would still be a qualified juror because what the law says is it doesn't even have to be a situation you could envision right now. Nobody is going to say, Mr. Brewer, what would it take for you, but what you have to be able to mean is that you would be open to it and that if you heard it, you would know it and you could do that.

> A. [BREWER]: And here, again, I would be open to it if it hit me . . . in the right way that I could swing from the death penalty to life in prison.

The State pointed out during its questioning that Brewer's answers from the questionnaire conflicted with those on the stand and sought to clarify Brewer's position.

> Q. [STATE]: [Y]ou initially said you don't think those issues are relevant to punishment, but we realize that you fill out this questionnaire before you know what the law is, as it pertains to these special issues. But I guess I might as well go ahead and ask you . . . talking about what we just talked about – and you see on the special issue there that – that it has you take into consideration the circumstances of the offense, but also the Defendant's character and background and their culpability, so a lot of things. Not just genetics, circumstances of birth, upbringing, and environment, but certainly probably their background and background encompasses that. Just to make sure that you are open to listening to everything and that you would consider what you heard.

---

[36] *Threadgill*, 146 S.W.3d at 668.

A. [BREWER]: Yes, I would.

Brewer's testimony demonstrates that, notwithstanding his responses to the questionnaire, he could follow the law and would wait to consider all of the evidence presented, including mitigation evidence, before determining his answers to the two special issues. Based on the record before us, the trial court properly denied appellant's challenge for cause to Jackie Brewer.

### 14. *Lisa Hensley*

In point of error fourteen, appellant claims that the trial court erred in denying the challenge for cause against potential juror Lisa Hensley. Appellant challenged Hensley because she was "death prone" and would automatically assess a death sentence if she found the defendant guilty of capital murder. Appellant points out that Hensley was "very adamant in her belief in an eye-for-an-eye and following the Bible."

Hensley stated on the record that she believes in and follows the Bible and that she attends church regularly. But when the defense asked about her church's doctrine regarding the death penalty, she responded: "I make my own opinion" and "It doesn't matter what they think." In Hensley's view, a death sentence "depends on the circumstances."

The record reflects that Hensley agreed with and could follow the law. She stated her belief that "we live under the law that we've written, so that's what we go by." She affirmed that she would "be able to wait and not make any automatic decisions until [she had] heard all the evidence presented at punishment," and stated that she agreed with this process because "[t]here could be extenuating circumstances . . . that should be considered." Hensley affirmed that she would "be open to listening and hearing about what the circumstances might be . . . in making a decision." Based

on the record before us, it was not an abuse of discretion for the trial court to deny appellant's

challenge for cause against Lisa Hensley.

### 15. *Debra Story*

In point of error fifteen, appellant claims that the trial court erred in denying the challenge

for cause against Debra Story. Appellant challenged Story on the basis that she is "death prone" and

would automatically assess a death sentence if she found the defendant guilty of the offense.

Appellant also claims on appeal that Story was challengeable because she had a bias toward law

enforcement; however the record does not demonstrate that her position regarding the credibility of

law enforcement was extreme or absolute.[37] Regardless, this claim was not presented to the trial

court and is therefore not preserved for review.[38]

The record shows that, while Ms. Story did state on her questionnaire that she believed in "an

eye for an eye," her answers during questioning made it clear that she would not automatically assess

the death penalty in every case.

> Q. [STATE]: [A]re you the type that could give fair consideration to the punishment evidence if you have found somebody guilty of capital murder?
>
> A. [STORY]: Oh, sure.
>
> Q. [STATE]: What I mean by that is you can't automatically say because I believe in an eye-for-an-eye or because I believe if you take a life, you deserve your life to be taken.
>
> A. [STORY]: Right. I – I think you need to look at the case. You need to look at all the – all the evidence, and I'm not eye-for-an-eye like you were saying. I guess I

---

[37] *See* footnote 24.

[38] *See* footnote 23.

believe in capital murder – I mean, capital punishment.

Q. [STATE]: I thought you did check eye-for-an-eye in your – you were – no, I'm sorry.

A. [STORY]: I mean, I guess I am. I – just because you find them guilty of murder, I would listen through the punishment phase or whatever and be open.

Story indicated that she would not make an automatic decision, but would be open and listen to all of the evidence before answering the special issues.

Q. [STATE]: Do you think, Ms. Story, honestly, you're the type of person that could go all the way through this process and depending on the evidence, if it left – if it led you to a death sentence, so be it, and if it led you to life without parole, so be it?

A. [STORY]: Yes, sir.

When the defense questioned Story about her responses on the questionnaire, she conceded that she had not completely understood the process and stages of a capital trial until after it was explained to her.

Q. [DEFENSE]: [H]ow do you feel about that distinction now that it's been explained to you?

A. [STORY]: Well, I mean, now that it's explained and I'm – I've been educated on it, I understand – I mean, I understand that the case is separate from the punishment . . . . You look at them separately, and it's not an automatic, you know, killing type thing. Like in my questionnaire, you know, I'm uneducated really, I'm just having my opinions and my first instinct is, you know, yes, he should have the death penalty. But I would listen to the case and be objective to it and be objective to the punishment, also.

After the law was explained to her, Story stated: "When the punishment phase started, I would start fresh." She also stated: "I know it's a very big responsibility, and I – you need to look at it openly when you come in here and listen."

Q. [DEFENSE]: Now that you understand the system, if you had the chance to fill out this questionnaire again, do you think you would have filled it out a little different?

A. [STORY]: I would probably. I think educating people – you know, when you learn the system and learn what, then you can make a good decision. I mean, we're just given these questionnaires, fill these out, and y'all can go home type thing . . . you're filling them out on what you hear, what you have been brought up to think, or whatever. And when you hear how the system works, you know, what's required of you, then you would look at this a little different, I think.

The record reflects that Story would not automatically assess a death sentence as appellant claims, but would follow the law and do what was required of her. The trial court properly overruled appellant's challenge to Debra Story.

### 3. *Conclusion*

After thoroughly reviewing the record of the voir dire proceedings, we find that there is sufficient evidence to support the trial court's denial of appellant's challenges for cause to the prospective jurors identified in points of error one through fourteen. Moreover, we find that there is sufficient evidence to support the trial court's denial of appellant's challenge for cause to Debra Story, who appellant identifies in point of error fifteen as the objectionable juror that he was forced to accept. Points of error one through fifteen are overruled.

### B. Constitutional Right to a Fair and Impartial Jury

In points of error sixteen and seventeen, appellant contends that the trial court's denial of his challenges for cause deprived him of a lawfully constituted jury and that he suffered a violation of his rights under the state and federal constitutions and under Article 35.16 of the Texas Code of Criminal Procedure. We have already held that the record supports the trial court's denials of

appellant's challenges for cause. Appellant has not shown that the trial court's rulings on his challenges were in error, nor that they resulted in the seating of a juror who was biased or prejudiced. Points of error sixteen and seventeen are overruled.

### III. GUILT PHASE ISSUES

#### A. Admissibility of Appellant's Confession

In point of error eighteen, appellant argues that the trial court erred in overruling his objection to the introduction into evidence of his videotaped statement to the police. Appellant contends that the admission of his statement was in violation of the requirements of *Miranda* and Article 38.22 of the Code of Criminal Procedure.[39] Appellant does not assert that he was not warned of his rights. Rather, he claims that, because he did not make an express waiver, he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights.

We have held that a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.[40] However, we have also held that a waiver need not assume a particular form, that neither a written nor an oral express waiver is required, and that in some cases, a waiver can be clearly inferred from the actions and words of the person interrogated.[41]

The question is not whether appellant explicitly waived his *Miranda* rights, but whether he

---

[39] Art. 38.22; *Miranda v. Arizona*, 384 U.S. 436 (1966).

[40] *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010) (citing *Miranda*, 384 U.S. at 475).

[41] *Id*. at 24-25 (citing *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979) and *Watson v. State*, 762 S.W.2d 591, 601 (Tex. Crim. App. 1988)).

waived them knowingly, intelligently, and voluntarily under the standard outlined in *Moran v. Burbine*.[42] The waiver inquiry under this standard has two distinct dimensions: (1) the waiver must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception; and (2) the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.[43] Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may we properly conclude that appellant's *Miranda* rights were properly waived.[44] This "totality-of-the-circumstances" approach requires consideration of all the circumstances surrounding the interrogation, including the defendant's experience, background, and conduct.[45]

Prior to trial, appellant objected to the admission of his statement to Detective Quirk, and the trial court held a *Jackson v. Denno* hearing to determine whether appellant's statement was voluntary and admissible.[46] The trial court found that appellant understood his rights, voluntarily waived those rights, and made his statement to the police voluntarily. We agree. The totality of the circumstances indicates that appellant knowingly, intelligently, and voluntarily waived his *Miranda* rights.

---

[42] *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011); *Joseph*, 309 S.W.3d at 25.

[43] *Joseph*, 309 S.W.3d at 25.

[44] *Id*.

[45] *Id*.; *see also Lucio v. State*, 351 S.W.3d 878, 893-94 (Tex. Crim. App. 2011) (stating that a "subsequent course of conduct" can show a waiver of rights).

[46] *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964).

The record reflects that before the interrogation began, Detective Quirk introduced himself and asked appellant if he needed anything, such as water or a cigarette or a bathroom break. Detective Quirk then stated: "[B]efore we start I need to read you your rights though, ok?" Appellant was shown a card containing the written warnings and was asked to read along as Detective Quirk read the warnings aloud. After Detective Quirk read the warnings, the following exchange occurred:

[QUIRK]: Do you understand your rights?

[APPELLANT]: Yes, sir.

[QUIRK]: Yes?

[APPELLANT]: Yes.

[QUIRK]: Ok. Umm. Like I said I got a whole lot of unanswered questions. And I'd like to talk to you about this. Are you good with that?

[APPELLANT]: Yes, sir.

Appellant then participated in the interview, which lasted over an hour. He was cooperative and answered every question asked of him. Detective Quirk later testified that appellant seemed dejected and somewhat remorseful. Appellant did not ask for an attorney, nor did he ask to terminate the interview at any time. At no point during the interrogation was appellant promised anything or threatened. Additionally, appellant is not a novice to the criminal justice system.[47] He has two prior criminal convictions and has experience with giving a confession to the police.[48]

---

[47] *See Nichols v. State*, 754 S.W.2d 185, 190 (Tex. Crim. App. 1988), *overruled on other grounds by Harris v. State*, 784 S.W.2d 5 (Tex. Crim. App. 1989), *and Green v. State*, 764 S.W.2d 242 (Tex. Crim. App. 1989).

[48] In 1990, appellant gave a written confession to an aggravated robbery at a grocery store.

Based on the totality of the circumstances in this case, the record supports the trial court's

finding that appellant knowingly, intelligently, and voluntarily waived his rights in accordance with

*Miranda* and Article 38.22.[49]  Point of error eighteen is overruled.

## B. Jury Argument

In points of error nineteen through twenty-four, appellant contends that the State made

improper jury arguments during the guilt stage of trial and that the trial court erred in overruling

appellant's subsequent objections and motions for mistrial.  Appellant sets out each complained-of

incident in a separate point of error, but argues that "the combination of and cumulative effect of

each issue presented as a group of issues involving the same or similar facts and same legal issue

would amount to reversible error."  He contends that the State's improper remarks "effectively told

the jury to find [appellant] guilty of capital murder so the jury could assess the death sentence

without any reference to the special issue submission on future dangerousness and or mitigation that

is the basis of our statutory scheme for potential death penalty cases."

### 1. *Overruled Objections*

In point of error nineteen, appellant argues that the trial court erred in overruling his objection

to the State arguing outside the record during the guilt stage of trial.  The complained-of argument

went as follows:

> [STATE]: Can you imagine what she went through, all while knowing that her baby
> girl was laying there on the bed watching this? Can you even imagine what the last
> moments of her life must have been like? And all the while, while she's being
> stabbed and bleeding and choked, wondering what is to become of her family at that
> point.

---

[49] Art. 38.22; *Miranda*, 384 U.S. 436.

And it didn't end there, did it? Because the monster wasn't done yet. Can you imagine the last hours of this little girl's life? When she got home with her mom and went into her room, did she get up on her bed and play with her dolls, or was she on the floor working on her school work when the monster walked into her room? What was she saying and what was she thinking when he put that duct tape over her mouth? And when he told her everything is going to be okay, as he was putting her arms behind her back and binding her feet, and what was she thinking about when she laid on that bed? Did he tie her to that bed with that phone cord to make her stay, or did she just stay because she didn't know what else to do while she laid there and watched her mother beg and plead for her life and get stabbed and choked and God knows what else happened in that bedroom that night while that little girl watched.

Can you imagine what she must have been thinking when this man picked her up and took her over her dead mother's body into that bathroom, that bathroom covered in blood, her mother's blood? The man that had blood all over his face took her, and while he filled up that bathtub with water, was he talking to her? Was she crying?

[DEFENSE]: Excuse me, Judge. Your Honor, I'm going to object – I'm going to object to the entire tone of the argument. This – the issue is guilt and guilt alone. And the argument prosecution is presenting to the jury has no relation to the issue of guilt of the Defendant. We're going to object to this opinion. It's outside the scope of this – this portion of the proceeding. We're going to object to it.

[THE COURT]: And it's overruled. [W]hat the attorney say[s] is not evidence. It's simply a closing argument.

Under Texas Rules of Appellate Procedure Rule 33.1(a)(1), a complaint must be made to the trial court by a timely request, objection, or motion.[50] The requirement of a timely trial-level complaint is satisfied "if the party makes the complaint as soon as the grounds for it become apparent."[51] Typically this means "as soon as the [objecting party] knows or should have known that

---

[50] TEX. R. APP. P. 33.1(a)(1); *Lackey v. State*, 364 S.W.3d 837, 843 (Tex. Crim. App. 2012).

[51] *Lackey*, 364 S.W.3d at 843.

an error occurred."[52]  Here, appellant objected only after the State had made several similar remarks

to the jury regarding what may have been going through the minds of the victims during the murders.

As such, this point of error was not preserved for appellate review.

In point of error twenty-one, appellant contends that the trial court erred in overruling his

objection to the State's closing argument as being outside the scope of guilt.  Appellant contends that

the State was trying to prejudice the jury in its determination of guilt by making an argument

concerning punishment.

> [STATE]: I want to talk to you about and ask you to recall, you know, when – when he's back there with Lovetta and she's trying to find, you know, some decency, she's trying to tell him, you're a good man, you're not a monster, but she was wrong. Almost 30 stab wounds.  Remember, he said we tussled for an hour and a half? About an hour and a half, they tussled in that bloody bathroom. She's trying to not only save her life, but at least don't kill Jazzmen, stab the baby, as her baby lays on the bed basically hogtied with duct tape.  You know, can you imagine what it must have been like for Lovetta, a mother? You know, even after you take those first few stab wounds, what it must have been like for a mother.
>
> [DEFENSE]: Your Honor, again, I'm going to object.  I want the record to formally reflect that I believe this – the entire scope of this argument is outside the issue as to the guilt or innocence of the Defendant and it is improper. And I think the Court certainly has within its discretion the ability to limit argument to the issues before the trier of fact at the particular time. This is the guilt phase, not the punishment phase.
>
> [STATE]: Judge, I'll move on.
>
> [THE COURT]: I understand. Record's made. Okay.
>
> [STATE]: I want you to – when you think about the horror that Gary Green inflicted and who we're dealing with, who we're talking about, and what type of person can look into the eyes of this little girl – what type of person can look into the eyes of this little girl –

---

[52]  *Id.*

[DEFENSE]: Judge, again, I'm going to renew my objection at this point in time. This argument is completely outside the scope of guilt argument.

[THE COURT]: Objection's overruled.

[DEFENSE]: And I'd ask that – I'd ask that – I'm sorry, Mr. Harris. So I'd ask that so I don't be required – and I apologize for interrupting –

[THE COURT]: You want a running objection?

[DEFENSE]: I want a running objection to the entire argument.

[THE COURT]: All right. You have a running objection. I think if – I think that it's going to cross – crosses the line, I will at that time sustain an objection.

Appellant's first objection was not preserved because no formal ruling by the trial court was made.[53] Appellant's second objection was overruled by the trial judge, after which appellant requested a running objection. However, this request for a running objection was not made on a timely basis.[54] Appellant failed to obtain rulings on prior objections as well as failed to object each time the State made similar impermissible jury arguments.[55] The jury had already heard previous similar remarks by the State with no objection. We need not decide whether the trial court erred in allowing the State's later remarks concerning the same subject matter because any error is harmless.[56]

Even if we were to find that the trial court erred in overruling appellant's objections to the

---

[53] TEX. R. APP. P. 33.1(a)(2)(A).

[54] *See Lopez v. State*, 253 S.W.3d 680, 684 (Tex. Crim. App. 2008).

[55] TEX. R. EVID. 103; *see id.*

[56] *See Saldano*, 232 S.W.3d at 102-03.

State's remarks in points of error nineteen and twenty-one, we determine that any error was harmless. Improper argument is non-constitutional error.[57] Texas Rules of Appellate Procedure Rule 44.2(b), which governs the harm analysis for non-constitutional error, provides that any "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."[58] In *Mosley v. State*, we held that determining harm under that standard in improper argument cases requires balancing the following three factors: (1) severity of the misconduct (prejudicial effect); (2) curative measures; and (3) the certainty of conviction absent the misconduct.[59]

Applying the three *Mosley* factors, we find that any error here was harmless. To begin, the level of misconduct, if any, was mild. The State's remarks did not inject any new facts into the record. The State simply asked the jury members to apply their general knowledge and experience to evidence that was properly before them and to imagine what was going through the minds of the victims during the murders.[60] The details in the State's remarks were a summation of or reasonable deduction from the evidence, most of which came from appellant's own confession describing the offense.

For the remarks in point of error nineteen, the trial judge overruled appellant's objection, but then immediately cleared up any possible misunderstanding by the jury by stating: "[W]hat the attorneys say is not evidence. It's simply a closing argument." For the remarks in point of error

---

[57] *Brown v. State*, 270 S.W.3d 564, 572 (Tex. Crim. App. 2008).

[58] TEX. R. APP. P. 44.2(b).

[59] *Mosley*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998);

[60] *Id*.

twenty-one, the trial judge did not perform any curative measures, but that is because he had overruled the objection, believing the statements to be permissible.

Finally, with regard to the certainty of conviction absent the misconduct, the evidence of appellant's guilt was overwhelming. Appellant wrote a letter prior to the offense about his plan to kill Lovetta, her children, and then himself, he confessed to the murders, he did not present any evidence at the guilt phase of trial to refute the State's charges, witness testimony corroborated appellant's confession, forensic evidence from the autopsies confirmed the causes of death and were in line with appellant's confession, and appellant's guilt was conceded during defense counsel's closing argument. The State's remarks likely had little or no prejudicial effect on the minds of the jurors in their determination of guilt. Points of error nineteen and twenty-one are overruled.

## 2. *Denial of Motion for Mistrial*

In points of error twenty, twenty-two, twenty-three, and twenty-four, appellant contends that the trial court erred in denying his motions for mistrial after the State made improper remarks during the guilt phase of trial. In point of error twenty, appellant complains about the following remarks made at the very beginning of the State's closing argument:

> [STATE]: Blind you? Ladies and gentlemen, we told you from the beginning that this was a horrific case, and that we start off with the guilt and innocence phase and then we move to the punishment phase. And in that punishment phase you would do what? You'd be asked to reconsider some of the evidence from the guilt and innocence phase. Remember, you got those two special issues to address? You got those two special issues to address. We told you that there would come a time when you would have to reconsider the evidence from the guilt and innocence phase. That's what we're talking about right now.

Appellant complains about the next portion of the State's closing argument in point of error

twenty-two:

> [STATE]: But again, he doesn't stop there. Now he showers. He puts on all black. All black. That's the evidence in this case. Why all black? Grim reaper? He knows exactly what he's doing. He's carrying out his manuscript. He's carrying out his plan. . . .
>
> He puts his black on and he goes up to the church. He goes to the church. That's the evidence in this case. And he goes and gets Jerrett and he goes and gets JT. He's sitting in church and not – not just talking about some little old small church. You're talking about a huge cathedral of worship. He's sitting in the church waiting on the boys. That's the predator we're talking about.
>
> When the boys come, what did y'all – what did y'all talk about in church today? That's the cold-hearted monster we're talking about.
>
> [THE COURT]: We're outside the scope of this case.
>
> [STATE]: That's what the boys told you, ladies and gentlemen. That's what the boys told you. He said, what did y'all learn in church today as he drove them back to their home where their mother and their sister lie dead in the bathroom. He drove them back to the home to –
>
> [THE COURT]: And these are not issues of guilt and innocence. It's not going to show intentional or knowing, or that this was part of the same criminal episode.
>
> [STATE]: He intentionally wrote out – he intentionally sat down, put pen to paper, he intentionally wrote out exactly what he was going to do. He knowingly went to that church. He intentionally took those boys back to that house to finish off his plan.
>
> [THE COURT]: Well okay. Stop. We have a running objection that he's not on trial for assaulting the boys. If he was on trial for assaulting the boys, I – I – remember, it's not – these are not –
>
> [STATE]: I'll move on.
>
> [THE COURT]: – not issues for guilt or innocence. The jury will disregard.

In point of error twenty-three, appellant complains about the last remarks made at the end of

the State's closing argument:

[STATE]: Ladies and gentlemen, there is no doubt that Gary Green is a capital murderer. You knew that from the time you heard the 911 tape and you hear those boys on there yelling, he killed my mamma, he killed my mamma and my little sister. You knew that then. From the time those boys walked in, you knew exactly what happened. Now, we're just simply asking – you make it official. You put the world on notice that Gary Green is a capital murderer. And just as he told you in his confession, he's a capital murderer that deserves the death penalty.

In each of these instances, the trial judge sustained appellant's objections to the State's remarks as being outside the scope of the guilt phase, and the jury was given prompt instructions to disregard. However, the trial court denied appellant's motions for mistrial. Appellant's last motion for mistrial, described in point of error twenty-four, took place after the jury had already been dismissed to deliberate. Appellant asked that the jury be admonished and instructed to disregard the State's last remark about the death penalty. The trial judge assured appellant that he had already given the jury an adequate instruction to disregard and then denied appellant's motion for mistrial.

A mistrial is the trial court's remedy for improper conduct that is "so prejudicial that expenditure of further time and expense would be wasteful and futile."[61] Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required.[62] When the trial court sustains an objection and grants an instruction to disregard, but denies the motion for mistrial, the proper issue to address is whether the refusal to grant the mistrial was an abuse of discretion on the part of the trial court.[63] The question of whether a mistrial for improper argument should have been

---

[61] *Hawkins v. State*, 135 S.W.3d 72, 76 (Tex. Crim. App. 2004).

[62] *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003).

[63] *Hawkins*, 135 S.W.3d at 76-77.

granted involves most, if not all, of the same considerations that attend a harm analysis.[64] To determine whether the trial court abused its discretion in denying appellant's motion, we balance the following three factors: (1) the severity of the misconduct; (2) any curative measures; and (3) the certainty of conviction absent the misconduct.[65]

The State's remarks were a small part of the State's entire closing argument at the guilt phase. The State's remarks did not tell the jury anything it did not already know. Moreover, the trial judge sustained appellant's objections, gave prompt curative instructions telling the jury to disregard the State's remarks and, on several occasions, reminded the jury to consider the issue at hand and to wait until the appropriate time to think about issues of punishment. Finally, with respect to certainty of conviction absent the misconduct, we have already noted the overwhelming evidence of appellant's guilt.

Given the brevity of the State's remarks, the lack of prejudice, the curative measures, and the strength of the evidence supporting appellant's conviction, we find that the trial court did not abuse its discretion in denying appellant's motions for mistrial. Points of error twenty, twenty-two, twenty-three, and twenty-four are overruled.

### 3. *Conclusion*

Appellant has not demonstrated error or harm in individual points of error nineteen through twenty-four, nor has he shown that the combination of and cumulative effect of each issue presented amounts to reversible error.

---

[64] *Id*. at 77.

[65] *Id*.

## IV. PUNISHMENT PHASE ISSUES

### A. Legal Sufficiency of the Evidence of Future Dangerousness

In point of error twenty-eight, appellant contends that there was insufficient evidence of future dangerousness because, with treatment for his mental illness, appellant is not a future danger. In our review of the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found, beyond a reasonable doubt, that there was a probability that appellant will commit further criminal acts of violence that would constitute a continuing threat to society, whether in or out of prison.[66]

In determining the special issues, the jury is entitled to consider all of the evidence at both the guilt and punishment stages of the trial.[67] Some factors the jury may consider when determining whether appellant will pose a continuing threat to society include: the circumstances of the offense, including the defendant's state of mind and whether he was working alone or with other parties; the calculated nature of his acts; the forethought and deliberation exhibited by the crime's execution; the existence of a prior criminal record and the severity of the prior crimes; the defendant's age and personal circumstances at the time of the offense; whether the defendant was acting under duress or the domination of another at the time of the offense; psychiatric evidence; and character evidence.[68]

Through testimony from family members and experts, during punishment appellant provided

---

[66] *Estrada v. State*, 313 S.W.3d 274, 284 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 905, 178 L. Ed. 2d 760 (2011).

[67] *Devoe v. State*, 354 S.W.3d 457, 462 (Tex. Crim. App. 2011).

[68] *See Waldrip v. State*, 56 S.W.3d 588, 594 (Tex. Crim. App. 2001); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

evidence of his state of mind during the offense as well as his mental illness. Appellant's aunt, Shirley Coleman, stated that the family has a history of mental illness. Appellant's grandmother, father, daughter, step-brother, aunts, and cousins have all suffered from mental illness throughout their lives. Many of them had been treated, hospitalized, and medicated because of their mental illnesses. She also testified that appellant's mother, Mary Sampson, was not an attentive mother to her children and at one point had a nervous breakdown and had to be hospitalized.

Mary testified that, during his teen years, appellant was paranoid. He would not sit with his back to the door and always had to have a [baseball] bat with him because he thought someone was trying to hurt him. She said that appellant's daughter, La Jay, acts similarly to how appellant acted when he was a child and is now seeing mental-health doctors and taking medication.

On the night of the present incident, Sampson picked up appellant. She said that appellant appeared to be drugged or under anesthesia. When she asked him what was wrong, he told her that he wanted to go to sleep and never wake up. She stated that appellant was remorseful and told her that Lovetta would come visit him and talk to him.

Appellant's ex-girlfriend, Lanelle Williams testified to appellant's quiet and withdrawn behavior and stated that she was surprised when she heard about the incident because appellant was never violent towards her. During the time that appellant and Williams lived together, Williams said that appellant would be in a room by himself and that she would hear him talking but could not understand what he was saying. On one occasion, appellant told her that vampires were following him home from work and that vampires live among them.

Expert testimony was used by appellant to show possible explanations for his lack of

treatment for his mental illness thus far in his life as well as the severity of his mental illness. Dr. Kellie Gray-Smith, a licensed specialist in school psychology and a special-education coordinator, testified that mental illness can be passed genetically and that members of the African-American community often shy away from mental-health treatment. She testified that there is a strong proven genetic and hereditary link between individuals passing on traits and symptomologies of mental illness and emotional behaviors. Problems with relating to peers, difficulty relating to adults, poor problem-solving skills, using aggression to solve problems, difficulty with everyday stressors, low self-esteem, and isolation could be expected in people who do not receive help for their mental illness.

Dr. Gray-Smith also testified that, in the African-American community, there is a general lack of understanding about mental health, a misrepresentation of treatment being more harmful than helpful, and a distrust of mental-health professionals. She said that the African-American community has a fear of the stigma attached to someone that receives mental-health treatment and a belief that bad behavior is to be addressed at home.

Dr. Gilbert Martinez, a clinical neuropsychologist, testified to appellant's mental illness as well as to its severity. Dr. Martinez reviewed appellant's medical records and previous evaluations, interviewed him, and administered a battery of psychological and neuropsychological tests. He stated that appellant's full scale I.Q. test showed him to be in the upper borderline range of 78 or 79. He testified that appellant did not have any severe memory problems or mental retardation but did have attentional problems. Consistent with his low I.Q., appellant had difficult with higher-level thinking, learning, and mental shifting.

Dr. Martinez testified that, in reviewing appellant's history and his test results, he determined that appellant suffered from severe chronic problems with mood that included both depression and episodes of agitation, irritability, and elevated moods that were associated with manic episodes or bipolarity. He said appellant was mistrustful of other people and was hypervigilant and suspicious. He testified that these problems meet the criteria for schizoaffective disorder of the bipolar type. In describing this disorder, Dr. Martinez explained that persons with schizoaffective disorder can have disturbances in thought where they have paranoid delusions. During these episodes of paranoid delusions, a person is likely to believe things that are not true, think that something is happening that is not, or think that people are trying to hurt him or conspire against him.

Appellant's medical records indicated that at Timberlawn, the mental hospital to which appellant was admitted a month before the incident, his doctors had diagnosed a major depressive disorder. Dr. Martinez testified that a major depressive disorder is a severe mental illness. Dr. Martinez explained that Timberlawn's diagnosis and his diagnosis of schizoaffective disorder are not mutually exclusive and share a lot of the same symptoms. Dr. Martinez testified that schizoaffective bipolar disorder is also a severe mental illness. A person with this disorder can be severely depressed, withdrawn, unmotivated, intensely sad, and can also have agitation, irritability, or an elevated mood.

Dr. Martinez stated that he also thought appellant had a borderline personality disorder. He said that people with this disorder can go into a rage and lose control of their behavior when they feel threatened or feel that something bad is going to happen to them. People with this disorder also have suicidal gesturing. They will tell people over and over again that they would rather die or that they

want to kill themselves. He said that appellant also had avoidant personality disorder and a depressive personality. Dr. Martinez testified that there was no doubt in his mind that appellant suffered from a severe mental illness, but the doctor could not say why appellant would kill someone because it was outside his expertise.

To demonstrate the calculated nature of the offense as well as the forethought and deliberation exhibited by the crime's execution, the State introduced into evidence the letter that appellant wrote before the murders and which spelled out his intentions and then introduced evidence that he followed through with those intentions by killing Lovetta and Jazzmen as well as attempting his own suicide. Appellant stabbed Lovetta more than twenty-five times, covering the bathroom in blood, and then drowned Jazzmen in the bathtub while her hands and feet were tied. Appellant then re-dressed, in all black, and went to pick up Lovetta's sons from their church program. After stabbing the younger son, Jerrett, appellant attempted to stab J.T., but missed. Appellant stopped short of murdering the entire family, as he had intended, only because the young boys pleaded for their lives, promising they would not tell anyone what had happened.

Through appellant's criminal history, the State provided evidence of appellant's multiple criminal charges, including drug possession, for which he received a four-year sentence, aggravated robbery (twenty years), aggravated assault (four years), and thirteen disciplinary violations while he was incarcerated, one of which was for assaulting a prison guard.

The aggravated-assault charge originated from an attack appellant committed on Jennifer Wheeler, one of appellant's high school classmates. Wheeler testified that she was attacked and stabbed by appellant and that, when she later awoke in the hospital, she had black eyes, a swollen

jaw, a missing tooth, and multiple stab wounds. When questioned about the attack, appellant showed little remorse and replied that he was young and wanted to see if he could get away with it.

Appellant's aggravated-robbery charge arose from his entering a grocery store and committing a robbery at gunpoint. Appellant had previously been employed at the grocery store. Shortly after he was released from prison, he was hired by local grocer Joseph Johnson. But after appellant was fired for giving a false reason for not showing up to work, he committed the armed robbery. Appellant later told his parole officer that he had committed the robbery, that this was not the only robbery in which he had been involved, and that he did it for a thrill and to see if he could get away with it.

The State presented evidence of appellant's dangerous behavior while in prison. When in prison for the aggravated robbery, he committed thirteen disciplinary violations. In one instance, he assaulted a prison guard. The guard, Kevin Ashford, testified that he had ordered appellant to sit with a group of prisoners so that Ashford could better monitor them. Appellant refused. When Ashford ordered appellant to step into the hall to speak to another officer, appellant threw a food tray at Ashford's mid-section.

Through testimony from his ex-girlfriends and Lovetta's children, the State also presented evidence of appellant's history of violence and abuse that was not documented in his criminal history. Shulonda Ransom, one of appellant's ex-girlfriends, testified that appellant abused her when she was pregnant with their first child and then again when she was pregnant with their second. Appellant would hit or choke her, apologize, tell her he would never do it again, and then repeat this abusive cycle. The last time appellant abused Ransom, he choked her until she passed out and then

stole everything from her apartment. Lovetta's children also testified at trial that appellant was physically abusive towards their mother in front of them.

Neither the State nor appellant presented appellant's age or personal circumstances as mitigating evidence, and appellant was not acting under duress or domination of another at the time of the offense. When we take all the *Keeton* factors into account and view the evidence in the light most favorable to the verdict, there is ample evidence upon which a rational fact finder could have found beyond a reasonable doubt that appellant was a future danger to society.[69]

Although the *Keeton* factors are all relevant, the circumstances of the offense "can be among the most revealing evidence of future dangerousness and alone can be sufficient to support an affirmative answer to that special issue."[70] A rational jury could find in this case that the circumstances of the crime alone indicate that appellant would commit future violent criminal acts. The murders were gruesome and calculated. Over the space of an hour and a half, appellant stabbed his wife more than twenty-five times. He drowned his step-daughter, changed clothes, and went to pick up his two step-sons from church. He then stabbed one of the boys as he pleaded for his and his brother's lives. Appellant then made the two boys view the bodies of their mother and sister. Given the heinous nature of the murders themselves, a rational trier of fact could have determined, beyond a reasonable doubt, that appellant would be an ongoing threat to society.

Appellant argues that his history of violence occurred while he was not being treated for his

---

[69] *Keeton*, 724 S.W.2d at 61.

[70] *Wilson v. State*, 7 S.W.3d 136, 142 (Tex. Crim. App. 1999) (citing *Bell v. State*, 938 S.W.2d 35, 41 (Tex. Crim. App. 1996)).

mental illness and that with treatment he would no longer be a future danger. However, appellant's

argument about treatment and its effect on his mental illness is unsubstantiated. When defense

counsel questioned Dr. Martinez about the treatment possibilities for appellant's mental illness, the

doctor testified that there was no doubt in his mind that appellant was very mentally ill but that

schizoaffective disorder can be a treatable condition. However, Dr. Martinez was unwilling to testify

conclusively that treatment would cease appellant's violent behavior.

> Q. [DEFENSE]: Schizoaffective disorder is an actual treatable medical slash mental condition, is it not?

> A. [MARTINEZ]: It's treatable, yes. I mean, there's medications that are given to treat it. It's a chronic condition, so it's something that happens throughout a person's life and it will recur. . . . So it's just like any other mental disorder where there are treatment options, but there's a lot of different factors that come into play as to whether a person does well or not.

Nowhere in Dr. Martinez's testimony does he indicate that appellant would not be a future

danger if he were given the proper medication for his mental illness. In fact, Dr. Martinez's

testimony indicates just the opposite. Depending on appellant's life, including his level of stress or

stability, his mental illness could either worsen or improve. This does not prove that, given the

proper medication, appellant would not be a future danger.[71]

Because the jury could have determined, either by considering the *Keeton* factors or by

looking at the offense itself, that there was a probability that appellant would commit further criminal

acts of violence that would constitute a continuing threat to society, point of error twenty-eight is

---

[71] Lastly, appellant contends that the jury's determination of future dangerousness was influenced more by the courtroom packed with friends and family of the victims rather than the evidence adduced at trial. There is no evidence of this.

overruled.

## B. Constitutionality of Executing the Mentally Ill

In point of error twenty-five, appellant contends that he had suffered from a severe mental illness before and during the commission of the offense and, therefore, it is in violation of the Eighth and Fourteenth Amendments of the United States Constitution to have the death penalty assessed as punishment.[72]  Evidence presented by appellant during the punishment phase was used to show that appellant had a history of mental illness and that he was hospitalized one month before the incident and diagnosed with a severe mental illness.  Appellant also provided testimony that multiple family members, including parents, children, and siblings, also suffered from mental illness.  To provide evidence that he was suffering from a mental illness at the time of the incident, appellant introduced evidence of his delusional thinking including that he thought Lovetta and her family were trying to conspire against him and that he tried to commit suicide the night of the incident, in an attempt to be reunited with the family in heaven.

Appellant acknowledges this Court's holding in *Mays v. State* but asks to preserve this issue for future possible reversal in the federal court system.[73]  Appellant believes that, in the future, the United States Supreme Court may extend the application of *Atkins v. Virginia* and *Roper v. Simmons* to ban execution as a punishment of the mentally ill.  However, we have rejected appellant's

---

[72] U.S. CONST. amend. VIII; U.S. CONST. amend. XIV.

[73] *Mays v. State*, 318 S.W.3d 368 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 1606, 179 L. Ed. 2d 506 (2011).

argument and are not persuaded to revisit it here.[74]  We, therefore, overrule point of error twenty-five.

### C. Denial of Motion for Mistrial

In point of error twenty-seven, appellant contends that the trial court erred in denying his motion for mistrial when the State questioned the witness, Mr. Ashford, about extraneous bad acts committed by others, which appellant claims had a prejudicial effect on the juror's minds.

Q. [STATE]: I mean, having a food tray thrown at you, Mr. Ashford, compare to getting stabbed in the back like you were; is that correct?

A. [ASHFORD]: Yep.

Q. [STATE]: That's a big deal, right?

A. [ASHFORD]: A little bit.

Q. [STATE]: Okay. And you also told us that during this time frame in a single shift, one day, you had to have 17 major uses of force?

A. [ASHFORD]: Yes, Sir.

[DEFENSE]: Judge, this is outside the record and I'm going to object to it.

[THE COURT]: I'm a little confused. Against Mr. Green?

[STATE]: No, no, no, in general, in one day where he had to hit 17 -

[THE COURT]: Alright. That's - - objection is sustained.

[DEFENSE]: I'm going to ask that the jury be instructed to disregard. It is irrelevant, it's improper.

[THE COURT]: Let's just focus on Mr. Green and - - and the actions of him.

---

[74] *See id.* at 379-80.

[DEFENSE]: Well, Judge, my objection to the question, and the whole line of questioning, is that it's irrelevant, and it's improper. The Court sustained it. I'm going to ask the jury be instructed at this time to disregard it.

[THE COURT]: Well, it's just a question. It's not evidence that -

[DEFENSE]: Well, the way he phrased it to the witness, he stated it as a fact and it's before this jury now [to] be considered a fact. We're going to object and ask the jury to be instructed to disregard it.

[THE COURT]: Okay. In an abundance of caution, the jury will disregard. But the jury is reminded that the questions the attorneys ask are not evidence. The answers to the questions - - that are evidence.

[DEFENSE]: And further, we move for a mistrial at this point, because I believe this is going to be a cumulative error that continues through this portion of the punishment phase.

[THE COURT]: Okay. That's denied.

Appellant argues that the obvious intent of the State was to prejudice appellant with the ill-will that any jury would feel toward incarcerated inmates who act out against guards and to put before the jury bad, irrelevant acts committed by others. Appellant contends that this "piling on" effect was prejudicial to the issue at hand and amounted to a denial of due process. Lastly, appellant claims that this error substantially affected his right to a fair trial free from prejudice and therefore could not be cured simply by an instruction to the jury to disregard.

Assuming the line of questioning was improper, we find that the State's line of questioning likely had little or no prejudicial effect. The record reflects that there was only a brief exchange between the State and the witness before appellant objected and the State explained that the incidents they were questioning the witness about were occurrences that happened, in general, one day. Moreover, the evidence was not specifically about appellant, so the prejudicial effect was minimal.

The record also reflects that the measure adopted to cure the misconduct was timely and efficient. The trial court sustained appellant's objection to the line of questioning and instructed the jury to disregard. Generally, an instruction to disregard cures any prejudicial effect.[75] We, as the appellate court, are to presume the jury followed the instruction to disregard.[76] The trial judge even went a step further and explained to the jury that questions asked by the attorneys are not evidence, but rather it is the answers to those questions that are evidence.

Given the strength of the evidence supporting the jury's answers to the special issues, the trial court's instruction to disregard, and the lack of prejudicial effect of the complained of testimony, we hold that the trial court did not abuse its discretion in denying appellant's motion for mistrial. Point of error twenty-seven is overruled.

### D. Admissibility of Extraneous Offense Evidence at Punishment

### 1. *Admission of Testimony Regarding an Extraneous Robbery*

In point of error twenty-nine, appellant contends that the trial court erred in overruling his objection to the admission of testimony regarding an extraneous bad act. The State wanted to cross-examine appellant's aunt, Shirley Coleman, about a robbery that appellant had allegedly admitted to her. Appellant argues that the State's notice of intent to introduce the evidence of the extraneous crime was unreasonable because it failed to follow the guidelines set forth in Texas Code of Criminal Procedure Article 37.07, § 3(g). Under Article 37.07, § 3(g), additional notice is required if an attorney intends to use evidence of an extraneous offense that has not resulted in a final conviction,

---

[75] *Hawkins*, 135 S.W.3d at 77.

[76] *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999).

as was the circumstance here.[77] To be reasonable, the notice must include the date on which and the county in which the alleged crime or bad act occurred.[78] The State provided notice to appellant of its intent, but did not provide the date or the county in which the offense occurred, and, therefore, the appellant contends that the notice was inadequate.

However, the notice provision applies only to evidence introduced in the State's case-in-chief, not when the State presents the evidence in rebuttal or during cross-examination, as occurred in the present case.[79] As such, the trial court did not err in overruling appellant's objection because the State was not required to give appellant any notice of its intent to introduce the evidence.

Even so, any error in the admission of the testimony did not affect appellant's substantial rights. Error in admitting evidence with insufficient notice under Article 37.07, § 3(g), is non-constitutional error.[80] Accordingly, we must disregard any error that does not affect appellant's substantial rights.[81] An error is considered to affect a person's substantial rights when the error had a substantial and injurious effect or influence on the jury's verdict.[82]

Here, the State gave appellant notice of its intent to introduce the evidence. Appellant even admitted that he had notice and that he knew to which aunt the notice was referring. Also, the

---

[77] *Id.*

[78] *Id.*

[79] *See Jaubert v. State*, 74 S.W.3d 1, 4 (Tex. Crim. App. 2002).

[80] *See Apolinar v. State*, 155 S.W.3d 184 (Tex. Crim. App. 2005).

[81] Tex. R. App. P. 44.2(b).

[82] *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

prosecutors did not provide the information about the date and county of the offense only because they did not have knowledge of those facts themselves. Thus, there is no indication from the record that the omission was intended to mislead appellant or prevent him from preparing a defense. There is also no indication that appellant was surprised; he admitted to having been given notice. Lastly, appellant failed to make any specific claims of how he was prejudiced or harmed by the lack of notice and how his defense would have been any different had he been given proper notice.

Because the record shows that appellant's ability to prepare for the evidence or otherwise present a defense was not impaired, we conclude that even if the notice were deficient, it did not affect appellant's substantial rights. Point of error twenty-nine is overruled.

## 2. *Admission of Excerpts of Letter Written by Appellant*

In point of error thirty, appellant complains about the trial court's admission of excerpts from letters that appellant wrote to his high-school classmate, Jennifer Wheeler, while appellant was incarcerated in the 1990s. As in point of error twenty-nine, appellant contends that the State failed to provide adequate notice of its intent to introduce this evidence under Article 37.07 of the Texas Code of Criminal Procedure. He also claims that, because the letters were twenty years old, they were too remote to be relevant to the issue of mitigation, thereby rendering them more prejudicial than probative.

Wheeler, who was one of the State's punishment witnesses, did not bring the letters to the attention of the State until the Friday before the punishment phase of trial began. As soon as the State became aware of the existence of the letters, it notified appellant of its intent to present the

evidence at punishment. When Wheeler brought the letters to the courthouse the following Monday, the State immediately made copies of the letters and gave them to defense counsel.

The State planned to use two excerpts from the letters as rebuttal evidence. The first excerpt stated:

> I'm currently attending college to get my associates and to hopefully start on my second degree before my time of release comes.

The second excerpt read:

> But I know that's all behind us now. Jennifer, when we first came as one, I said if you ever _____ me over and think you can play with my feeling I'll kill you. Isn't that what I said????
>
> You see you and nobody else can just turn on my feelings and turn them off when you get ready. I'm not make out of that can of material.
>
> I have associated with people on both sides of the laws. I just choose to go the wrong way. With me doing the wrong that placed me here. It's wasn't the money mostly, it was the high of dong wrong and getting away with it. I wasn't on drugs or alcohol like to think I was completely sane at that time. You see I know what it takes to make and be success. But this place at this time is the best place for me.
>
> Understand what I'm talking about first before you make a judge of my sanity. When I was out my people will tell you that if I wasn't incarcerated at the time of the summer of 1990 I would have killed up a lot of people or been killed!! Really, because I was I really was livin for day to day . . . . Not caring about life and people.
>
> (State's Exhibits 148A and 148B) (grammatical and spelling errors in original).

Appellant objected to the admission of the letter excerpts on the basis that he did not receive adequate notice. Appellant contends that he was surprised by the evidence and was not able to use the information in conjunction with his preparation for trial. Because the letters were given to appellant only at the commencement of the punishment evidence, he claims he was not able to

prepare an adequate defense strategy for the punishment hearing.

The State was not required to give appellant notice of its intent to introduce the letter excerpts because the letters were not evidence of an extraneous offense. Even if the letters were considered extraneous-offense evidence, as we stated in point of error twenty-nine, if evidence is being offered in rebuttal or cross-examination, the State is not required to give notice.[83] Here, the letters were used by the State to rebut appellant's claims of mental illness and low I.Q. Appellant had already introduced testimony from his family members about the family history of mental illness, and appellant argued that, with treatment, he would no longer be a future threat to society. Appellant had also presented evidence that he had a low I.Q., struggled with problem solving, and was unsuccessful in school. In the letters, appellant stated that he was "completely sane" and that he "choose[s] to go the wrong way" for the "high of do[i]ng wrong and getting away with it." He also reported that he was getting his associate's degree and would hopefully start on his second degree soon. Because the two excerpts were offered to rebut appellant's previous arguments, the State was not required to give appellant notice, and, for that reason, appellant's contention regarding lack of notice is without merit.

Moreover, even if the State had been required to give appellant notice, the record reflects that the State's notice and production of the letters, in light of their late discovery, were timely. As soon as the State became aware of the existence of the letters, it notified appellant of its intent to present the evidence at punishment. The State also provided copies of the letters as promptly as possible after receiving the letters at the court the following Monday. The record reflects that the State was

---

[83] *See Jaubert*, 74 S.W.3d at 4; *Washington v. State*, 943 S.W.2d 501 (Tex. App.—Fort Worth 1997, pet. ref'd).

not acting in bad faith. Notice could not have been provided any sooner because the State itself was unaware of the existence of this evidence. Additionally, appellant was provided copies of the letters before the punishment phase began and had four days to prepare a defense or cross-examination. He has failed to show that his defense strategy would have been different had he been notified of the letters any sooner or that his defense was "injuriously" affected by the State's lack of notice.[84]

Appellant also objected to the content of the letters on the basis that the letters were too remote to be relevant and had no probative value as to the special issues. We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard.[85] The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement.[86]

Under Rule 403, evidence that is relevant and admissible may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.[87] Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial.[88] Unfair prejudice does not arise from the mere fact that evidence injures a party's case.[89] Virtually all testimony and evidence will be

---

[84] *See Hernandez v. State*, 176 S.W.3d 821, 825-26 (Tex. Crim. App. 2005).

[85] *Davis*, 329 S.W.3d at 802 (citing *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007)).

[86] *Id.*

[87] Tex. R. Evid. 403.

[88] *See Young v. State*, 283 S.W.3d 854, 876 (Tex. Crim. App. 2009).

[89] *See Casey v. State*, 215 S.W.3d 870, 883 (Tex. Crim. App. 2007).

prejudicial to the opposing party, as that is the central point of offering evidence.[90] It is only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value that Rule 403 applies.[91]

The letters tended to rebut appellant's claims that his behavior was the result of mental illness rather than an antisocial personality. This is relevant and very probative as to appellant's future dangerousness, given the violent nature of the previous crime and the similarity of the threats in the letter to the present offense. Also, the letters did not contain any subject matter that would confuse or mislead the jury, and the matters were neither complicated nor technical. We hold that the trial court could have reasonably concluded that the testimony did not tend to confuse or distract the jury from the primary issues and that it did not cause unfair prejudice.

Based on the above-mentioned reasons, the trial court could have reasonably concluded that the evidence was more probative than prejudicial. The trial judge's decision was within the zone of reasonable disagreement, and, therefore, does not amount to an abuse of discretion. Point of error thirty is overruled.

## V. CONSTITUTIONAL ISSUES REGARDING THE DEATH PENALTY

In points of error thirty-one through forty-six, appellant raises constitutional challenges to the Texas death-penalty statute. In point of error thirty-one, appellant claims that "the statute under which [he] was sentenced to death is unconstitutional in violation of the cruel and unusual

---

[90] *Id.*

[91] *Williams v. State*, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997).

punishment prohibition of the Eighth Amendment because it allows the jury too much discretion to determine who should live and who should die and because it lacks the minimal standards and guidance necessary for the jury to avoid the arbitrary and capricious imposition of the death penalty." In point of error thirty-two, appellant claims that "the statute under which [he] was sentenced to death is unconstitutional in violation of the Eighth Amendment as interpreted in *Penry v. Johnson* because the mitigation special issue sends mixed signals to the jury thereby rendering any verdict reached in response to that special issue intolerable and unreliable."[92]

In point of error thirty-three, appellant claims that "the statute under which [he] was sentenced to death is unconstitutional in violation of the due process requirements of the Fourteenth Amendment because it implicitly puts the burden of proving the mitigation special issue on appellant rather than requiring a jury finding against appellant on that issue under the beyond a reasonable doubt standard." In point of error thirty-four, appellant claims that "the trial court erred in denying [his] motion to hold Article 37.071 Sec. 2(e) and (f) concerning burden of proof unconstitutional as a violation of Article One Sec. 10 and Sec. 13 of the Texas Constitution."

In point of error thirty-five, appellant claims that "the Texas Death Penalty scheme violates due process protections of the United States Constitution because the punishment special issue related to mitigation fails to require the State to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt, contrary to *Apprendi* and its progeny."[93] In point of error

---

[92] *Penry v. Johnson*, 532 U.S. 782, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001).

[93] *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

thirty-six, appellant claims that "the Texas Death Penalty scheme violated [his] rights against cruel and unusual punishment and due process of law under the Eighth and Fourteenth Amendments to the United States Constitution by requiring at least ten 'no' votes for the jury to return a negative answer to the punishment special issues."

In point of error thirty-seven, appellant claims that "the Texas Death Penalty scheme violated [his] rights against cruel and unusual punishment, an impartial jury and to due process of the law under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because of vague, undefined terms in the jury instructions at the punishment phase of the trial that effectively determine the difference between a life sentence and the imposition of the death penalty." In point of error thirty-eight, appellant claims that "the Texas Death Penalty scheme denied [him] due process of law, and imposed cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution because of the impossibility of simultaneously restricting the jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence militating against imposition of the death penalty."

In point of error thirty-nine, appellant claims that "the Texas Death Penalty scheme denied [him] due course of law, and imposed cruel and unusual punishment, in violation of Article I, §§ 13 and 19, of the Texas Constitution because of the impossibility of simultaneously restricting the jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence militating against imposition of the death penalty." In point of error forty, appellant claims that "the trial court erred in overruling [his] motion to hold Art. 37.071 Sec. 2(e) and (f) unconstitutional because said statute fails to require the issue of mitigation be considered by the

jury."

In point of error forty-one, appellant claims that "the statutory '*Penry*' special issue in Tex. Code Crim. Pro. Arts. 37.071 & 37.0711 is unconstitutional because it fails to place the burden of proof on the State regarding aggravating evidence." In point of error forty-two, appellant claims that "the statutory '*Penry*' special issue is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution because it permits the very type of open-ended discretion condemned by the United States Supreme Court in *Furman v. Georgia*."[94]

In point of error forty-three, appellant claims that "Texas' statutory capital sentencing scheme is unconstitutional under the Eighth and Fourteenth Amendments because it does not permit meaningful appellant review." In point of error forty-four, appellant claims that "the trial court erred in overruling [his] motion to quash the indictment as being unconstitutional based on the enumerated constitutional defects of the Texas capital murder death penalty law."

In point of error forty-five, appellant claims that "the cumulative effect of the above-numerated constitutional violations denied [him] due process of law in violation of the Fifth and Fourteenth Amendments of the United States Constitution." In point of error forty-six, appellant claims that "the cumulative effect of the above-enumerated constitutional violations denied [him] due course of law under Article I, § 19, of the Texas Constitution."

In his brief, appellant acknowledges that the challenges he raises in points of error thirty-one

---

[94] *Furman v. Georgia*, 408 U.S. 238 (1972).

through forty-six have been previously submitted and overruled by this Court.[95] He asserts these issues in order "to invite this Court to review any prior stand on any issue and more importantly to preserve each issue for further review in the Federal Court system." We decline appellant's invitation to review our prior decisions on these issues.[96] Points of error thirty-one through forty-six are overruled.

The judgment of the trial court is affirmed.

DELIVERED: October 3, 2012
DO NOT PUBLISH

---

[95] *Saldano v. State*, 232 S.W.3d 77 (Tex. Crim. App. 2007).

[96] *Id*. at 108-09.